GARY M. RESTAINO
United States Attorney
District of Arizona
JENNIFER F. LEVINSON
Arizona State Bar No. 020551
Assistant United States Attorney
Two Renaissance Square
40 North Central Avenue, Suite 1800
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
jennifer.levinson@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>v.<br><br>$43,258.00 in United States Currency,<br><br>          Defendant *In Rem*. | **VERIFIED COMPLAINT FOR FORFEITURE *IN REM*** |

Plaintiff United States of America brings this Complaint and alleges as follows in accordance with Rule G(2) of the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"):

## NATURE OF THE ACTION

1. This is a civil action *in rem*, brought to enforce the provision of 21 U.S.C. § 881(a)(6) for the forfeiture of property which represents money or other things of value furnished or intended to be furnished by a person in exchange for a controlled substance, proceeds traceable to such an exchange, and money used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*.

2. This is a civil action *in rem*, brought to enforce the provision of 18 U.S.C. § 981(a)(1)(A) and (C) for the forfeiture of United States currency which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, including but not limited to dealing in a controlled substance and 18 U.S.C. § 1952, travel in interstate commerce with the intent to distribute proceeds of unlawful activity as defined in 18 U.S.C. §§ 1952, 1956(c)(7) and 1961.

3. Venue and jurisdiction in Arizona are based upon 21 U.S.C. § 881(j) and 28 U.S.C. § 1355(b) and § 1395 as acts and omissions occurred in the District of Arizona that rise to this forfeiture action. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1345 and 1355 and 18 U.S.C. § 981(h).

**DEFENDANT *IN REM***

4. The defendant $43,258.00 in United States currency ("defendant property") was seized on September 9, 2021, at Phoenix Sky Harbor International Airport. The defendant property is currently in the custody of the United States Marshals Service.

**INTRODUCTION**

5. The following information describes an investigation conducted by members of the United States Drug Enforcement Administration (DEA) Phoenix Financial Investigation Group's Commercial Narcotic Interdiction Unit (FIG/CNIU). The FIG/CNIU is made up of Phoenix Police Department (PPD) Commercial Narcotic Interdiction Unit detectives deputized as DEA Task Force Officers, DEA Special Agent Kenneth Theriault, and Homeland Security Investigations Special Agent Rhonda Cantrell (collectively referred to as "investigators"). FIG/CNIU is located at Phoenix Sky Harbor International Airport. FIG/CNIU investigators conduct financial investigations pursuant to seizures made by members of the FIG/CNIU. The primary responsibility of the FIG/CNIU is to investigate crimes involving the use of commercial airlines and shipping companies to transport illegal drugs and drug proceeds.

6. Based on training and experience and information obtained from law enforcement throughout the country, investigators are aware that cities in the mid-west and east coast, including St. Louis, Missouri, are known demand locations for illicit drugs. States such as Arizona and California, are considered source locations due to their proximity to the border of Mexico and established drug transportation routes.

7. Based on training and experience, investigators are aware that persons involved in the trafficking and distribution of illicit drugs often hire couriers to transport

2

illicit drugs and/or proceeds from the sale of illicit drugs utilizing commercial airlines and shipping companies. Airline travel allows for last minute travel arrangements, often within 24 to 48 hours of departure and the ability to travel long distances in short periods of time. The use of couriers aboard commercial airlines provides lower risk of detection by law enforcement as well as lower operating costs. It is also common for these illicit drug/money couriers to travel on one-way tickets due to the uncertainty and volatile nature of the illicit drug trafficking and distribution business as persons traveling to source cities from demand cities with U.S. currency to be used to purchase illicit drugs often contend with several logistical issues before the drug transaction is complete.

8. Based on training and experience and information obtained from law enforcement throughout the country, investigators are aware that proceeds from the sale of illicit drugs are transported from demand locations to source locations. Once the proceeds from the sales of illicit drugs reach source cities the proceeds will be used to purchase more illicit drugs. The illicit drugs will then be shipped or carried by couriers to the demand locations for sale and distribution. Illicit drug trafficking organizations and illicit drug business entrepreneurs find this lucrative because the illicit drugs are purchased in source locations for relatively low cost and sold in demand locations for a significantly higher price thus creating high profit margins.

9. Based on training and experience and information obtained from law enforcement throughout the country, investigators also know that illicit drug money couriers traveling with co-conspirators often divide the couriered money amongst each other and distance themselves from one another during travel in an attempt to be inconspicuous and lessen the risk of losing the proceeds.

10. In their effort to identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates, investigators utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence.

11. Based on their training and experience, some of the factors that constitute suspicious flight itineraries include airfare purchase at the counter immediately prior to departure or short notice reservations for a one-way travel, sometimes paid in cash. Couriers travel with minimal or no luggage and will often attempt to board the aircraft at the last possible moment. Drug and/or money couriers utilize these techniques to conceal their identities from law enforcement authorities and minimize their exposure to commercial airlines.

## BACKGROUND

12. On September 9, 2021, investigators assigned to the FIG/CNIU received ticket information listing the flight itinerary for passengers Calvin K. Walters (WALTERS) and Tyrone Chappell Jr. (CHAPPELL) each traveling one-way aboard Southwest Airlines flight #3555 from St. Louis, Missouri to Phoenix, Arizona on September 9, 2021.

13. The ticket information indicated that the tickets were purchased within 24 hours of departure.

14. Prior to WALTERS' arrival in Phoenix, FIG/CNIU investigators' search of law enforcement databases revealed the following drug related arrests by the St. Louis County Police Department:
   a. September 20, 2019 - Possession of a weapon/felony-controlled substance and distribution of controlled substances;
   b. January 4, 2018 - Possession of marijuana (35grams or less) and possession of a miscellaneous controlled substance; and
   c. March 15, 2017 - Possession of marijuana.

15. A criminal history query of CHAPPELL revealed he has prior convictions out of Missouri for one count of Miscellaneous Controlled Substances in 2006 and two counts of Trafficking in Drugs/Attempt Second Degree in 2008. He had also been arrested in Missouri for the following:
   a. Trafficking in Drug/Attempt Second Degree on February 13, 2006;

  b. Miscellaneous Controlled Substance and Distribution/Delivery of Manufactured Controlled Substance on August 24, 2006;

  c. Trafficking in Drugs/Attempt Second Degree on August 30, 2006;

  d. Miscellaneous Controlled Substance on July 4, 2012; and

  e. Misdemeanor Possession of a Controlled Substance, Possession of Up to 35 Grams Marijuana, and Possession of Controlled Substance on September 24, 2021. Additionally, investigators learned CHAPPELL had three extraditable active felony warrants in Missouri.

***Consensual Contact and Interview – Calvin K. Walters***

16. After the flight, investigators observed WALTERS exit the jetway and wait in the gate area. DEA Task Force Officer Travis Myers (TFO Myers) contacted WALTERS. TFO Myers introduced himself, showed WALTERS his law enforcement credentials and asked WALTERS if he could speak with him. WALTERS agreed.

17. During the consensual contact, TFO Myers determined WALTERS was traveling with one small bag (worn across his torso) and one checked suitcase.

18. TFO Myers asked WALTERS if he was traveling with any narcotics or large amounts of United States currency. WALTERS stated he was traveling with approximately $40,000.00. WALTERS added that he was a rapper, and the purpose of the currency was to pay another rapper with whom he was collaborating.

19. When asked if he was traveling with heroin, cocaine, methamphetamine, or marijuana, WALTERS said no.

20. WALTERS consented to a search of his small carry-on bag and his checked suitcase.

21. WALTERS showed TFO Myers a light brown cloth sack inside his small carry-on bag. Inside the light brown cloth sack was a large amount of currency. A portion of the currency was held together with a rubber band, and another portion was fanned out

in the bottom of the sack along with broken rubber bands. TFO Myers also observed additional loose currency outside the sack in the bottom of the carry-on bag.

22. When asked how much currency he was traveling with, WALTERS said, "somewhere around forty-three thousand". WALTERS added that he had an electronic money counting machine in his checked bag.

23. WALTERS agreed to accompany investigators to the FIG/CNIU office located in Terminal 4 to obtain an exact amount of currency in his possession and speak with investigators about the origin and purpose of the money.

24. During a consensual search of WALTERS' checked suitcase, investigators located an electronic money counting machine and a plastic bag containing approximately 58 grams of marijuana.

25. The total count of currency located inside WALTERS' carry-on bag and in his pocket was $43,258.00.

26. The currency in WALTERS' possession consisted of 1,077 twenty-dollar bills ($21,540.00), a denomination that is associated with street-level drug sales. The rest consisted of 88 one-dollar bills, 74 five-dollar bills, 91 ten-dollar bills, 73 fifty-dollar bills and 167 one-hundred dollar bills. A large amount of money like this, with vast majority of the bills in the twenty-dollar denomination, is evidence that the money is drug-related. *United States v. $27,800 in United States Currency*, 2017 WL 6345394, at *4 (S.D. Cal. Dec. 8, 2017); *United States v. Approximately $17,872 in United States Currency*, 2009 WL 2990496, at *3 (N.D. Cal. Sept. 11, 2009). Moreover, bundling of a large amount of currency using rubber bands is further evidence of a connection to drug trafficking or other illegal activity *United States v. $36,000.00 in U.S. Currency*, 2018 WL 839865, at *6 (C.D. Cal. Feb. 8, 2018); *United States v. $105,180 in U.S. Currency*, 2013 WL 2153326, at *8 (D. Ariz. May 17, 2013).

27. WALTERS again explained that he was a rapper, and the purpose for traveling with the currency was to pay a prominent rapper with whom he was collaborating forty thousand dollars to record songs together.

28. WALTERS stated the prominent rapper was based in Kentucky but would be traveling to Arizona to meet him. WALTERS was unable or unwilling to provide investigators with contact information for the prominent rapper or business manager for the prominent rapper.

29. When asked what studio they would be using to record the music, WALTERS said he did not know.

30. When asked where he was staying while in Arizona, WALTERS stated he had not made hotel reservations but was planning on staying at a hotel near the airport.

31. WALTERS initially stated that he was traveling with a female friend. He later identified CHAPPELL as his best friends' brother who was accompanying him on his trip to Arizona.

**Source of the currency in WALTERS' Possession**

32. Investigators asked WALTERS how he obtained the money he was traveling with. WALTERS stated his mother, Latonya Walters, had distributed large amounts of money to him over the last seven months.

33. WALTERS said most of the money Latonya Walters distributed to him originated from an inheritance Latonya Walters received after the death of her mother, Mildred Marie Walters.

34. WALTERS also stated he received money after the death of his grandfather on his father's side.

35. WALTERS explained that between July 2020 and May 2021, he received one distribution of $60,000.00 and three distributions of $30,000.00 from his mother ($150,000.00) as well as two distributions of $20,000.00 ($40,000.00) after the death of his grandfather on his father's side.

7

36. Investigators asked WALTERS for a telephone number for Latonya Walters. Investigators called the telephone number numerous times while WALTERS was present and numerous times in the days following contact with WALTERS. Each of the calls to the number provided by WALTERS resulted in a busy signal.

37. WALTERS was unable to or unwilling to provide his mother's address.

38. WALTERS was unable to or unwilling to provide any additional information to corroborate the origin of the currency in his possession.

39. When asked why he was traveling with an electric money counter, WALTERS stated he did not want to count the money by hand.

40. WALTERS advised investigators that he utilized Green Dot online bank for banking services. WALTERS used one of his cellular telephones to show investigators his account balance of $221.67.

41. WALTERS advised his only job is being a rapper.

42. Based upon training and experience, investigators know drug traffickers and/or money couriers often lack an ability to produce a consistent, logical explanation regarding the purpose of travel and the reason for transporting large quantities of currency. Further, numerous bundles rubber-banded currency is not indicative of legitimate business transactions.

43. During their search, investigators did not locate any bank withdrawal receipts, or deposit receipts. Investigators found currency stacked inside the light brown cloth sack, inside WALTERS' pocket, and in the bottom of the carry-on bag.

44. WALTERS was in possession of three cellular telephones. He explained that one telephone was used for his family, one was used for his rap business, and one was used for his friends.

45. Based on training and experience, investigators know that those involved in the illicit drug trade often have multiple phones in order to isolate the phone they use for drug transactions from their personal phone, helping them avoid detection.

46.     WALTERS gave consent to allow TFO Myers to look through the recent text messages and photographs in his cellular telephones. The telephone WALTERS described as being used for family had a dead battery and was inaccessible.

47.     DEA TFO Myers observed several text messages in each of the remaining two telephones that indicated WALTERS was selling illicit drugs. The messages included prices, names, quantities of illicit drugs, and requests for illicit drugs.

48.     The following appeared in one of the phones, starting with the following outgoing message:

Tuesday August 17, 12:15 PM - Hey everybody I got some new stuff in

I got caps fire caps and ice and Zannys

    28 for bill

    30 for bill

    10 dollars a bar white bars

    325 for oz of ice

    175 for half of ice

    120 for quarter of ice

    80 for ball of ice

Wednesday August 18 2:20 PM –

    30 for 100 way

    Be there in 8 mins

    Come down 367

    We here

    Thanks

4:16 PM - We over at churches chicken parking lot –

Response: Ok

Friday August 20 1:52 PM – Hey would you throw me a zany until tomorrow it for Susie

9

1. Monday August 23 2:28 PM – 7232 natural bridge
2. Friday August 27 10:06 AM - Hey everybody good news
3. 42 for bill only have to spend 100
4. 325 a zip on ice
5. 170 for half
6. 125 for quarter
7. 80 for a ball
8. White zany bars 10 dollars
9. Aderall 10 dollars
10. Sunday morning everybody I will be giving testers out
11. Sunday August 29, 9:43 AM – Hey everybody good news
12. 42 for bill only have to spend 100
13. 325 a zip on ice
14. 170 for half
15. 125 for quarter
16. 80 for a ball
17. White zany bars 10 dollars
18. Aderall 10 dollars
19. Sunday morning everybody I will be giving testers out
20. Address all today 301 Kalen ave
21. Sunday August 29, 6:51 PM – Still 42 for a bill?
22. Response: 40
23. Anyway u can bring it to me Im in stl on bates street
24. Sunday August 29, 9:52 PM – Just seen I missed your call…I got a bill on pills if
25. u can come through tonite if not then il come though in the morning
26. Tuesday, 7:08 PM –
27. Fire batch 40 for bill
28.

      Fire batch of ice

      75 ball

      120 quarter

      170 half

      320 zip

      Zanny bars 10 a piece white

49. Based on their training and experience, investigators know that, in the context of selling illicit substances, the following words have the following meanings: "zip" is an ounce, "half" is 1/2 ounce, "quarter" is 1/4 ounce, "ball" is 8-ball, street slang for 1/8 ounce, a "bill" is 100, "zany bars" are Xanax, and "ice" is Methamphetamine.

50. Both telephones included several pictures of large amounts of currency in rubber banded bundles.

51. When asked about the about the text messages, WALTERS admitted to selling quantities of marijuana in Missouri.

52. WALTERS appeared nervous after TFO Meyers viewed the text messages and spontaneously told investigators he was currently an informant for the FBI in Missouri and had made several purchases of illicit drugs at the FBI's direction.

53. Investigators contacted FBI Special Agents in Missouri who stated WALTERS was never an informant but did cooperate with law enforcement until he was found to be unreliable.

**Contact with Tyrone Chappell**

54. DEA TFO Lamberto and officers with the Phoenix Police Department contacted CHAPPELL in the jetway and arrested him for his outstanding felony warrants. CHAPPELL was in possession of $9,132.00 at time of arrest. CHAPPELL denied traveling with WALTERS and told TFO Lamberto he was traveling alone.

**Additional Seizure**

55. On October 20, 2021, the FBI executed a search warrant at WALTERS' St. Louis residence where agents seized firearms, ammunition, $54,873.00 in U.S. currency and drug paraphernalia to include multiple electric grinders, pill press devices, sifters and scrappers. Also seized were multiple plastic bags containing pills, capsules, and powdery substances in various quantities.

*Administrative Claim*

56. On May 23, 2022, DEA received a claim to the $43,258.00 from Latonya Walters.  The Interest in Property Information section of the online claim states: please explain why you have a valid, good faith and legally recognizable interest in this asset. Latonya Walters responded, "*I gave my son to hold the money for me because am not good with money I got the money from my mother from her passed away*".

57. As supporting documentation for her claim, Latonya Walters provided a one-page image of a USBank statement for Money Market Savings account number ending 5468 held in the name of Latonya Walters, statement period August 21, 2020, through September 21, 2020.  The statement reflected a beginning balance on August 21, 2020, of $10.00 and a deposit of $49,069.75 on September 21, 2020. No additional portions of the statement were provided.

## FIRST CLAIM FOR RELIEF

Based on the aforementioned facts and circumstances, the defendant currency was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., and therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6).

## SECOND CLAIM FOR RELIEF

The defendant property constitutes or is derived from proceeds traceable to some

form of specified unlawful activity, conducted and attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America prays that process of warrant *in rem* issue for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted this 17th day of August 2022.

>GARY M. RESTAINO
>United States Attorney
>District of Arizona
>
>*S/Jennifer F. Levinson*
>JENNIFER F. LEVINSON
>Assistant United States Attorney