**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>$43,258.00 in United States Currency,<br><br>Defendant. | No. CV-22-01388-PHX-DWL<br><br>**ORDER** |

Pending before the Court is Plaintiff's motion for default judgment. (Doc. 11.) For the following reasons, the motion is granted.

## BACKGROUND

At Phoenix Sky Harbor Airport, members of the United States Drug Enforcement Administration's ("DEA") Phoenix Financial Investigation Group's Commercial Narcotic Interdiction Unit ("FIG/CNIU") "utilize a variety of resources, including confidential informants, suspicious flight itineraries, other law enforcement agencies, and prior knowledge of criminal activity or intelligence" in order to "identify and disrupt potential drug and/or money couriers related to drug organizations and criminal syndicates." (Doc. 1 ¶¶ 5, 10.) Members of the FIG/CNIU seize illicit drugs and drug proceeds and FIG/CNIU investigators conduct financial investigations pursuant to these seizures. (*Id.* ¶ 5.) "Based on training and experience and information obtained from law enforcement throughout the country," FIG/CNIU investigators "are aware" that St. Louis, Missouri is a "demand" location and Phoenix, Arizona is a "source" location for illicit drugs and that "proceeds

from the sale of illicit drugs are transported from demand locations to source locations." (*Id.* ¶¶ 6, 8.) The investigators are further aware that drug/proceeds couriers often book one-way tickets within 48 hours of departure and travel with co-conspirators. (*Id.* ¶¶ 7, 9.)

On September 9, 2021, Calvin K. Walters ("Calvin") and Tyrone Chappell Jr. ("Chappell") flew from St. Louis to Phoenix on Southwest Airlines flight #3555 with one-way tickets purchased within 24 hours of departure. (*Id.* ¶¶ 12-13.) Both Calvin and Chappell had a record of various drug-related arrests. (*Id.* ¶¶ 14-15.)

Upon arriving at Phoenix Sky Harbor Airport, Calvin was greeted by DEA Task Force Officer Travis Myers. (*Id.* ¶ 16.) Officer Myers introduced himself, showed Calvin his law enforcement credentials, and asked Calvin if he could speak with him. (*Id.*) Calvin agreed. (*Id.*) Officer Myers asked Calvin if he was traveling with any narcotics or large amounts of United States currency, and Calvin replied that he was traveling with approximately $40,000. (*Id.* ¶ 18.) Calvin added that he was a rapper and intended to use the money to pay another rapper with whom he was collaborating. (*Id.*) Calvin "was unable or unwilling" to provide the contact information for the collaborating rapper or his business manager or the name of the recording studio. (*Id.* ¶¶ 27-29.)

Calvin initially stated that he was traveling with a female friend, but later identified Chappell as his best friend's brother who was accompanying him on his trip to Arizona. (*Id.* ¶ 31.) Meanwhile, another DEA task force officer, accompanied by Phoenix Police Department officers, contacted Chappell in the jetway and arrested him for outstanding felony warrants. (*Id.* ¶ 54.) Chappell was in possession of $9,132.00 and denied traveling with Calvin. (*Id.*)

When asked where he planned to stay while in Arizona, Calvin stated he planned to stay in a hotel near the airport but had not yet made reservations. (*Id.* ¶ 30.)

Calvin denied traveling with drugs and consented to having his bags searched. (*Id.* ¶¶ 19-20, 24.) The searches revealed a light brown cloth sack inside Calvin's carry-on bag that contained a large amount of cash (a portion of which was bound with a rubber band, while the rest was loose among broken rubber bands), an electronic money-counting

machine, a plastic bag containing approximately 58 grams of marijuana, and three cellular phones. (*Id.* ¶¶ 21, 24, 44.)

The currency in Calvin's possession consisted of 167 one-hundred-dollar bills, 73 fifty-dollar bills, 1,077 twenty-dollar bills, 91 ten-dollar bills, 74 five-dollar bills, and 88 one-dollar bills, for a total of $43,258.00. (*Id.* ¶¶ 25-26.) When asked how he had obtained the money, Calvin said that his mother, Latonya Walters ("Latonya"), had inherited the money after the death of her mother and had distributed large amounts of money to him over the past seven months and that, additionally, he had received money following the death of his paternal grandfather. (*Id.* ¶¶ 32-35.) When asked for Latonya's contact information, Calvin provided a phone number but "was unable or unwilling" to provide her address or "any additional information to corroborate the origin of the currency in his possession." (*Id.* ¶¶ 36-38.) Calls to the phone number Calvin provided for Latonya consistently were met with a busy signal. (*Id.* ¶ 36.)

Calvin consented to allow Officer Myers to look through the recent text messages and photographs in his three cell phones. (*Id.* ¶ 46.) He explained that he used one phone for family, one for his rap business, and one for his friends. (*Id.* ¶ 44.) The phone he described as being for family had a dead battery, but Officer Myers was able to view text messages on the other two phones that contained prices, names, and quantities of illicit drugs and requests for illicit drugs and was also able to view photographs of large amounts of currency in rubber banded bundles. (*Id.* ¶¶ 47-50.) When asked about the text messages, Calvin admitted to selling marijuana in Missouri. (*Id.* ¶ 51.)

At that point, Calvin "appeared nervous" and "spontaneously told investigators he was currently an informant for the FBI in Missouri and had made several purchases of illicit drugs at the FBI's direction." (*Id.* ¶ 52.) Investigators contacted FBI Special Agents in Missouri who stated that Calvin was never an informant but did cooperate with law enforcement until he was found to be unreliable. (*Id.* ¶ 53.)

The $43,258.00 in United States currency ("defendant property") was seized at the airport and is currently in the custody of the United States Marshals Service. (*Id.* ¶ 4.)

On October 20, 2021, the FBI executed a search warrant at Calvin's residence in St. Louis, which resulted in the seizure of firearms, ammunition, $54,873.00 in U.S. currency, drug paraphernalia including multiple electric grinders, pill press devices, sifters and scrappers, and multiple plastic bags containing pills, capsules, and powdery substances in various quantities. (*Id.* ¶ 55.)

On May 23, 2022, DEA received a claim to the defendant property from Calvin's mother, Latonya. (*Id.* ¶ 56.) The "Interest in Property Information" section of the online claim states: "please explain why you have a valid, good faith and legally recognizable interest in this asset." (*Id.*) Latonya responded, "I gave my son to hold the money for me because am not good with money I got the money from my mother from her passed away." (*Id.*) As supporting documentation for her claim, Latonya Walters provided a one-page image of a USBank statement for a Money Market Savings account number ending 5468 held in the name of Latonya Walters, statement period August 21, 2020, through September 21, 2020, reflecting a beginning balance on August 21, 2020 of $10.00 and a deposit of $49,069.75 on September 21, 2020. (*Id.* ¶ 57.) No additional portions of the statement were provided. (*Id.*)

On August 17, 2022, Plaintiff filed the verified complaint for forfeiture *in rem*. (Doc. 1.) The following day, a warrant for the arrest of the defendant property issued. (Doc. 3.) The United States Marshals Service seized and took possession of the currency on August 24, 2022. (Doc. 5.)

On November 7, 2022, Plaintiff filed a notice that service had been executed pursuant to Rule G(4) of the Federal Rules of Civil Procedure Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims by posting "a notice of forfeiture on an official government internet site (www.forfeiture.gov) for at least thirty consecutive days, beginning August 25, 2022 and ending September 23, 2022." (Doc. 6.)

On November 8, 2022, Plaintiff filed a second notice of service indicating that "on August 24, 2022, notice of the forfeiture was sent to Latonya Walters and on September 13, 2022, notice of the forfeiture was sent to Calvin K. Walters by First Class and Certified

U.S. Mail," and that each mailing had included the complaint and other case documents. (Doc. 7.)

On November 15, 2022, no response to the complaint having been filed, Plaintiff filed an application for entry of default "against the interest of Latonya Walters, Calvin K. Walters and all others in the defendant property." (Doc. 8.) The following day, the Clerk entered default. (Doc. 9.)

On December 30, 2022, Plaintiff filed the pending motion for default judgment. (Doc. 11.) No response has been filed.

## ANALYSIS

I. <u>Forfeiture Procedures</u>

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs forfeiture actions *in rem*.[1]

Rule G(2) states that the complaint must:

(a) be verified;

(b) state the grounds for subject-matter jurisdiction, in rem jurisdiction over the defendant property, and venue;

(c) describe the property with reasonable particularity;

(d) if the property is tangible, state its location when any seizure occurred and—if different—its location when the action is filed;

(e) identify the statute under which the forfeiture action is brought; and

(f) state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.

The complaint in this action conforms in all respects. (Doc. 1.)

Next, Rule G(3) mandates a warrant and supplemental process. Those procedures were followed here. (Doc. 3; Doc. 11 at 2.)

Next, Rule G(4) sets forth the notice requirements, which include notice by publication as well as notice to known potential claimants. When the government knows

---

[1] *See also* 21 U.S.C. § 881; 18 U.S.C. § 981.

1 the identity of the property owner, the Due Process Clause of the Fifth Amendment
2 "requires the Government to make a greater effort to give him notice than otherwise would
3 be mandated . . . ." *United States v. Real Prop.*, 135 F.3d 1312, 1315 (9th Cir. 1998);
4 *United States v. $296,000.00 in U.S. Currency*, 2012 WL 3260442, *3-4 (E.D. Cal. 2012).
5 The government must provide notice that is "reasonably calculated, under all the
6 circumstances, to apprise interested parties of the pendency of the action and afford them
7 an opportunity to present their objections." *Dusenbery v. United States*, 534 U.S. 161, 168
8 (2002). Rule G(4)(b)(iii)(A) likewise provides that "[t]he notice must be sent by means
9 reasonably calculated to reach the potential claimant."[2]

10 Here, the government sent the notice of forfeiture, complaint, and scheduling order
11 via First Class and Certified U.S. Mail to both Calvin and Latonya at two separate Missouri
12 addresses, which the Court assumes are the last-known addresses for these individuals.
13 (Doc. 7.) Courts have held that certified mail may be a means of providing notice
14 reasonably calculated to reach known potential claimants. *$296,000.00 in U.S. Currency*,
15 2012 WL 3260442 at *4-5. The Court concludes that the government satisfied the notice
16 requirements.

17 The complaint indicates that on May 23, 2022—several months before the
18 complaint was filed—the DEA received a claim to the defendant property from Latonya.
19 (Doc. 1 ¶ 56.) The complaint does not indicate how the claim was received or whether the
20 agency responded. Nevertheless, under Rule G(5), it was incumbent upon Latonya to file
21 a claim in the context of this action by the deadline indicated in the notice and to file an
22 answer or Rule 12 motion no later than 21 days after filing the claim. "Failure to comply
23 with the procedural requirements for opposing the forfeiture precludes a person from
24 establishing standing as a party to the forfeiture action." *United States v. 2007 Chevrolet*

---

[2] An optional way to provide notice is by serving a summons under Rule 4. Fed. R. Civ. P. 4(n)(1) ("The court may assert jurisdiction over property if authorized by a federal statute. Notice to claimants of the property must be given as provided in the statute or by serving a summons under this rule."). *See generally $296,000 in U.S. Currency*, 2012 WL 3260442 at *4 ("Notwithstanding the Supplemental Rules . . . the Government provides sufficient notice if such notice complies with Federal Rule of Civil Procedure 4 requirements.").

*Tahoe SUV*, 2010 WL 489682, *4 (E.D. Cal. 2010). Neither Calvin nor Latonya has participated in any manner in this litigation. Accordingly, the government has satisfied the procedural requirements for bringing this forfeiture action *in rem*.

II.     Default Judgment Standard

The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

"[T]he general rule" for default judgment purposes "is that well-pled allegations in the complaint regarding liability are deemed true." *Fair Housing of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). "The district court is not required to make detailed findings of fact." *Id.* "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

III.    The First, Fifth, Sixth, And Seventh *Eitel* Factors

In cases like this one, where no one aside from Plaintiff has participated in the litigation at all and the motion for default judgment is uncontested, "the first, fifth, sixth, and seventh [*Eitel*] factors are easily addressed." *Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, *3 (D. Ariz. 2020).

The first factor weighs in favor of default judgment. "[D]enying the motion would unduly prejudice the Government because it would be required to litigate this action even though no potential claimants have appeared to contest this forfeiture." *United States v. $27,800 in U.S. Currency*, 2017 WL 6345394, *4 (S.D. Cal. 2017).

The fifth and sixth factors weigh in favor of default judgment or are neutral. Because no potential claimant has participated, there is no dispute over material facts and

no indication that default is due to excusable neglect.

The seventh factor generally weighs against default judgment, given that cases "should be decided on their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of Rule 55(b), which authorizes default judgments, "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177.

IV. The Fourth *Eitel* Factor—The Amount Of Money At Stake

Under the fourth factor, the Court considers the amount of money at stake in relation to the seriousness of the conduct at issue in the litigation. The amount at stake, $43,258.00, is a substantial amount of money. This factor weighs against granting default judgment. Nevertheless, courts have granted default judgments in similar cases. *$296,000.00 in U.S. Currency*, 2012 WL 3260442 at *7 ("[T]he sum of money in dispute here [$52,120.19] is not substantial enough to warrant the denial of the Government's motion.").

V. The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint. "These two factors are often analyzed together and require courts to consider whether a plaintiff has stated a claim on which it may recover." *Vietnam Reform Party v. Viet Tan - Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (internal quotation marks omitted). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id*.

The complaint seeks forfeiture under two theories. First, the complaint asserts that "the defendant currency was furnished or intended to be furnished by a person in exchange for a controlled substance or listed chemical in violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 et seq., or constitutes proceeds traceable to such an exchange, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. § 801 et seq., and [is] therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6)." (Doc. 1 at 12.) Second, the complaint asserts that the "defendant property constitutes or is derived from proceeds traceable to some form of specified unlawful activity, [was used to] conduct[] and

attempted to conduct a financial transaction, i.e., the movement of the proceeds of trafficking in controlled substances in violation of 18 U.S.C. § 1952, and therefore is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C)." (*Id.* at 12-13.)

"Under 21 U.S.C. § 881(a)(6), seized money is subject to forfeiture if it is (1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 979-80 (9th Cir. 2002). "The government has the initial burden of establishing probable cause connecting the seized property with illegal drug transactions." *Id.* In a contested action—unlike this one—the burden then shifts to a claimant "to prove by a preponderance of the evidence, that the money was not connected with illegal drug activity." *Id.*

"The determination of probable cause is based on the aggregate of facts, including circumstantial facts." *Id.* "The government must show that it had reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion but less than prima facie proof." *Id.* "Each case stands upon its own facts, and the presence or absence of any one fact is not dispositive; indeed probable cause is not an exacting standard." *Id.*

Here, the facts, when viewed in the aggregate, establish probable cause that the defendant property was obtained as proceeds from selling illicit drugs. The most telling facts are Calvin's text messages containing pricing and requests for various illicit drugs, Calvin's possession of marijuana and confession to selling marijuana, the large sum of money itself, much of it in $20 bills, bundled with rubber bands,[3] and the drug paraphernalia, firearms, cash, and apparent drugs found at Calvin's home. Calvin's inability to provide a consistent or detailed alternative explanation for how he obtained the

---

[3]  According to the well-pleaded allegations in the complaint, which are accepted as true in light of the default, investigators consider a "large amount of money" with a "vast majority of the bills in the twenty-dollar denomination" to be "evidence that the money is drug-related" and consider "bundling" the money "using rubber bands" to be "further evidence" of "drug trafficking or other illegal activity." (Doc. 1 ¶ 26.)

money or why he was carrying it,[4] his one-way ticket, his electronic money-counter and three cell phones, his history of drug-related arrests, and his affiliation with Chappell are also telling. Taken as a whole, the Government had reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion.

VI. Balancing The Factors

Having considered the *Eitel* factors, the Court concludes that default judgment is appropriate.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for default judgment (Doc. 11) is **granted**. A separate judgment will issue, after which the Clerk shall terminate this action.

Dated this 15th day of March, 2023.

Dominic W. Lanza
United States District Judge

---

[4] Plaintiff notes that "Latonya Walters did submit a claim wherein she stated that she had given the defendant property to her son (Calvin K. Walters) to hold because she was not good with money and went on to advise that she obtained the defendant funds from her mother upon her passing" and asserts that "[w]hile this explanation is consistent with Calvin K. Walters' assertion that the defendant property came from his mother, it contradicts his assertion that the money was in fact his and he intended to use it to further his rap career." (Doc. 11 at 5.) The Court does not agree that Calvin's explanation necessarily undermined his mother's claim. Latonya could have entrusted her inheritance to her son's safekeeping, and her son could have decided to spend his mother's money on his rap career rather than safeguarding it for her. However, in the absence of Latonya's participation in this litigation, the Court does not hesitate to conclude that the facts here provide reasonable grounds to believe a connection existed between the property and drug activities, supported by more than mere suspicion.